# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

_____

PATRICIA PALMA,

               Plaintiff,

      v.

HARLEYSVILLE LIFE INSURANCE
COMPANY,

               Defendant.

_____

Civil No. 12-2337 (NLH/KMW)

**OPINION**

**APPEARANCES**:

Gilbert W. Bates, Esquire
520 E. Myrtle Avenue
Lindenwold, New Jersey 08021

John C. Penberthy, III Esquire
Penberthy & Penberthy, PC
2020 Springdale Road
Suite 400
Cherry Hill, New Jersey 08003
    *Attorneys for Plaintiff Patricia Palma*

Joshua Bachrach, Esquire
Heather Janene Austin, Esquire
Wilson, Elser, Moskowitz, Edelman, & Dicker, LLP
Independence Square West
The Curtis Center
Suite 1130 East
Philadelphia, Pennsylvania 19106
    *Attorneys for Defendant Harleysville Life Insurance
    Company*

**HILLMAN, District Judge**:

    This matter comes before the Court by way of Defendant
Harleysville Life Insurance Company's motion [Doc. No. 11] for
summary judgment pursuant to Federal Rule of Civil Procedure 56.
Plaintiff did not file opposition to Defendant's motion, and the

time within which to do so has now expired.  The Court has

reviewed Defendant's submissions and decides this matter pursuant

to Federal Rule of Civil Procedure 78.

For the reasons expressed below, Defendant's motion will be

granted.

## I.    JURISDICTION

Plaintiff brings this action against Defendant Harleysville

Life Insurance Company ("Defendant" or "Harleysville") claiming

entitlement to benefits under a group long term disability plan

and asserting violations of the Employee Retirement and Income

Security Act ("ERISA"), 29 U.S.C. § 1001 et seq.  The Court

exercises jurisdiction over Plaintiff's federal claims under 28

U.S.C. § 1331 and 29 U.S.C. § 1132(e).

## II.   BACKGROUND

Plaintiff was previously employed as an Office Controller

with Contempalonial Enterprises, Inc. until approximately

February 10, 2009.  (Local Rule 56.1 Statement of Facts in Supp.

of Def.'s Mot. for Summ. J. [Doc. No. 11-2] (hereinafter, "Def.'s

SOF"), ¶ 1.)[1]  As an Office Controller, Plaintiff "earned a gross

_____

[1]    The facts set forth in this Opinion are taken largely from
Defendant's Local Rule 56.1 Statement of Facts in Support of the
Motion for Summary Judgment [Doc. No. 11-2], as supplemented by
portions of the Administrative Record submitted by Harleysville
in connection with this motion.  As set forth more fully infra,
because Plaintiff failed to oppose Defendant's motion for

monthly salary of $6,500" and was "entitled to participate in Contempalonial's group long term disability plan, at no cost to her." (Def.'s SOF ¶¶ 2-3.) Defendant Harleysville issued the long term disability policy insuring the plan. (Id. ¶ 4; Mem. of Law in Supp. of Def.'s Mot. For Summ. J. [Doc. No. 12] (hereinafter, "Def.'s Mem."), 1.)

Under the terms of the group long term disability policy ("the Policy") issued by Harleysville,[2] "in the event of a disability and after a 90-day elimination period has been satisfied, Harleysville ... pays a monthly disability benefit during the first 24 months of a claim if the insured is unable to

_____

summary judgment, the Court deems these facts as undisputed for purposes of deciding this summary judgment motion. See Loc. Civ. R. 56.1(a); cf. Smith v. Addy, 343 F. App'x 806, 808 (3d Cir. 2009) (analyzing similar local rule for the Middle District of Pennsylvania and concluding that "[b]ecause [the nonmovant] neglected to file 'a separate, short and concise statement of material facts, responding to the numbered paragraphs set forth' in [the movant's] statement of facts, the District Court was entitled to deem the statement of facts as admitted.")

[2] Harleysville acknowledges that Custom Disability Solutions serves as Defendant's claim advisory agent with respect to administration of the Policy at issue here. (Mem. of Law in Supp. of Def.'s Mot. For Summ. J. [Doc. No. 12] 1 n.1.) Harleysville concedes that to the extent Custom Disability Solutions took any actions relevant to this case, such actions were made on behalf of Harleysville. Thus, for the sake of clarity and ease of reference, this Opinion, like Defendant's motion, refers only to Harleysville even when describing actions taken by Custom Disability Solutions. (Id.)

'perform all of the substantial material duties of [her] occupation on a fulltime basis and is not being paid for performing any work or service because of a Disability, (a) caused by Injury or sickness; and (b) that started while insured under this coverage.'" (Def.'s SOF ¶ 7) (citing Administrative Record[3] ("AR") 370.) The monthly benefit provided under the Policy is "equal to 60% of the insured's gross monthly earnings[.]" (Def.'s SOF ¶ 8.)

At some point during the Policy period,[4] Plaintiff became disabled, stopped working as an Office Controller, and submitted a claim for long term disability benefits under the Policy. (See Pl.'s Compl. [Doc. No. 1] ¶ 4; Def.'s SOF ¶ 5.) Plaintiff asserted that she was "incapable of working or performing basic household chores." (Def.'s SOF ¶ 6.) In a telephonic interview with Plaintiff on June 18, 2009, Plaintiff indicated to Defendant's representative that "she [was] in constant pain" and

---

[3]    Citations to the Administrative Record are made to the "AR" numbered pages of documents filed on the docket at [Doc. Nos. 11-5, 11-6, 11-7, 11-8, 11-9, 11-10, 11-11, 11-12, 11-13, 11-14, 11-15, 11-16].

[4]    Neither Plaintiff's compliant, nor Defendant's Statement of Facts specifies precisely when Plaintiff became disabled. However, a letter dated June 18, 2009, from Custom Disability Solutions to Plaintiff, indicates that Plaintiff's "date of disability has been determined to be February 11, 2009[.]" (AR 618.) The letter further explains that Plaintiff's disability "benefits were due to begin on May 12, 2009." (Id.)

that she could not walk or wear high heels, and could not sit at the computer because she would "go[] into spasms[.]" (AR 621.) Plaintiff further indicated that she was unable to wash dishes, to walk up the steps carrying a laundry basket, or to go purchase groceries by herself as a result of her continuous pain. (Id. at 622.)

In support of her claim for long term disability benefits, Plaintiff submitted to Harleysville a statement from her family physician, Herman Cohen, D.O., which indicated that Plaintiff had been diagnosed with migraine headaches, cervical radiculopathy,[5] cervical strain,[6] and depression. (Def.'s SOF ¶ 9.) As a result of his diagnosis of Plaintiff, Cohen "limited Plaintiff's

---

[5]     By way of background, the American Academy of Orthopedic Surgeons' website explains that "[s]ome people have neck pain that may radiate into the shoulder and arm.  This type of pain is often caused by an injury near the root of a spinal nerve.  A nerve root injury is sometimes referred to as a 'pinched' nerve. The medical term for this condition is cervical radiculopathy." See OrthoInfo, AM. ACAD. OF ORTHOPEDIC SURGEONS, http://orthoinfo.aaos.org/topic.cfm?topic=A00332 (last visited Dec. 17, 2013).

[6]     The Court notes for informational purposes only that "[c]ervical sprains and strains are common injuries of the neck, resulting in pain, stiffness, muscle spasm or weakness.  A cervical sprain is an injury to the ligaments in the neck. Cervical strains are injuries to the muscles in the neck."  See Cervical Sprain/Strain, NYSPORTSMED, http://www.nysportsmed.com/Neck-Pain/cervical-sprainstrain.html (last visited Dec. 17, 2013).

activities, namely sitting, standing and walking, to one hour each and prohibited her from lifting any amount." (Id. ¶ 10.) Based on the information available to Harleysville at that time, Defendant approved Plaintiff's claim and paid the full benefit amount of $3,900 per month[7] without any offset from May 12, 2009 through August 23, 2010. (Id. ¶¶ 11-12.)

However, by August 2010, Harleysville determined it was necessary to discontinue Plaintiff's benefits because "additional documentation showed [that] Plaintiff was not disabled." (Id. ¶ 13.) This additional documentation included in-person observations and video surveillance conducted by Claims Bureau USA, Inc. in June of 2010. During this surveillance, "Plaintiff was observed shopping, driving, walking without difficult, jogging a short distance, and carrying large [shopping] bags."[8] (Id. ¶ 14.) As a result of the information obtained through these surveillance efforts, Harleysville "scheduled a functional capacities evaluation ["FCE"] to assess Plaintiff's abilities[.]" (Id. ¶ 15.) Plaintiff confirmed her attendance for the FCE but ultimately did not attend the FCE as scheduled. (Id.)

---

[7]  The amount of $3,900 per month is equal to sixty percent (60%) of Plaintiff's gross monthly salary of $6,500.

[8]  Claims Bureau USA, Inc. also prepared a detailed written report documenting these in-person observations and video surveillance. (See AR 309-320.)

6

Thereafter, Harleysville discontinued Plaintiff's long term disability benefits and informed her of the reasons for its decision by letter dated August 24, 2010.  (<u>See</u> AR 265-269.)

Plaintiff subsequently appealed Harleysville's decision to discontinue her long term disability benefits.  (<u>Id.</u> ¶ 16.)  In support of her appeal, Plaintiff submitted a statement from another one of her treating physicians, Vincent Padula, D.O., attesting to her continuing status as disabled and her inability to work.  (<u>Id.</u> ¶ 17; AR 56.)  Padula was subsequently asked to review the video surveillance obtained by Harleysville, and afterwards he "acknowledged that Plaintiff appears to have no restrictions with movement while turning her head; was capable of using her upper extremities 'w/o difficulty;' and that her demonstrated abilities were not consistent with her reports to ... Padula."  (Def.'s SOF ¶ 23; AR 127-128.)

In the course of reviewing Plaintiff's appeal, and because Harleysville did not have the opportunity to conduct a FCE of Plaintiff, Harleysville arranged to have Marianne Jacobs, D.O., conduct an independent review of the documentation contained in Plaintiff's claim file, including the all medical reports and the video surveillance.  (Def.'s SOF ¶ 18; AR 119.)  Jacobs ultimately concluded that "neither Plaintiff's symptoms (subjective and/or objective) nor the effects of treatment she

was receiving would preclude her from working." (Def.'s SOF ¶ 19) (citing AR 142-146.) Jacobs "found no support for Plaintiff's complaints of disability and concluded [she] ha[d] no restrictions whatsoever related to walking, standing or sitting[.]" (Def.'s SOF ¶ 20.) After receiving this information from Padula and Jacobs, Harleysville denied Plaintiff's appeal by letter dated March 10, 2011. (See AR 117-125.) This suit followed.

## III. DISCUSSION

### A. Summary Judgment Standard

In the present motion, Harleysville seeks the entry of summary judgment in its favor on all of Plaintiff's claims. Summary judgment is appropriate where the Court is satisfied that "'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'" Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986) (citing Fed. R. Civ. P. 56).

An issue is "genuine" if it is supported by evidence such that a reasonable jury could return a verdict in the nonmoving party's favor. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A fact is "material" if, under the governing

8

substantive law, a dispute about the fact might affect the outcome of the suit. <u>Id.</u> "In considering a motion for summary judgment, a district court may not make credibility determinations or engage in any weighing of the evidence; instead, the nonmoving party's evidence 'is to be believed and all justifiable inferences are to be drawn in his favor.'" <u>Marino v. Indus. Crating Co.</u>, 358 F.3d 241, 247 (3d Cir. 2004) (citing <u>Anderson</u>, 477 U.S. at 255).

Initially, the moving party bears the burden of demonstrating the absence of a genuine issue of material fact. <u>Celotex</u>, 477 U.S. at 323 ("[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." (citation omitted); <u>see also</u> <u>Singletary v. Pa. Dept. of Corr.</u>, 266 F.3d 186, 192 n.2 (3d Cir. 2001) ("Although the initial burden is on the summary judgment movant to show the absence of a genuine issue of material fact, 'the burden on the moving party may be discharged by "showing" -- that is, pointing out to the district court -- that there is an absence of evidence to support the nonmoving

party's case' when the nonmoving party bears the ultimate burden of proof.") (citing <u>Celotex</u>, 477 U.S. at 325).

Once the moving party has met this burden, the nonmoving party must identify, by affidavits or otherwise, specific facts showing that there is a genuine issue for trial. <u>Celotex</u>, 477 U.S. at 324. A "party opposing summary judgment may not rest upon the mere allegations or denials of the ... pleading[s.]" <u>Saldana v. Kmart Corp.</u>, 260 F.3d 228, 232 (3d Cir. 2001) (internal quotations omitted). For "the non-moving party[] to prevail, [that party] must 'make a showing sufficient to establish the existence of [every] element essential to that party's case, and on which that party will bear the burden of proof at trial.'" <u>Cooper v. Sniezek</u>, 418 F. App'x 56, 58 (3d Cir. 2011) (citing <u>Celotex</u>, 477 U.S. at 322). Thus, to withstand a properly supported motion for summary judgment, the nonmoving party must identify specific facts and affirmative evidence that contradict those offered by the moving party. <u>Anderson</u>, 477 U.S. at 256-57.

A movant, however, is not automatically entitled to summary judgment where the nonmoving party fails to respond to the motion. <u>Zrodskey v. Head Classification Officer</u>, No. 11-00283 JAP, 2013 WL 275493, at *1 (D.N.J. Jan. 24, 2013). Instead, summary judgment will be granted "only if the moving party has

10

established that summary judgment is appropriate." <u>Id.</u> (citing <u>Anchorage Assocs. v. V.I. Bd. of Tax Rev.</u>, 922 F.2d 168, 176 (3d Cir. 1990)). Generally, it is impermissible for a district court to provide by local rule that a motion for summary judgment will be automatically granted when the opposing party fails to respond. <u>Anchorage</u>, 922 F.2d at 175.

As noted previously, a district court's local rules may, however, provide that the nonmovant's failure to respond to a summary judgment will be construed as a waiver of her opportunity to controvert the facts asserted by the moving party. <u>Id.</u> at 175-76. In keeping with this premise, Local Civil Rule 56.1(a) in the District of New Jersey provides that "any material fact not disputed [by the opponent] shall be deemed undisputed for purposes of the summary judgment motion." L. Civ. R. 56.1(a). Plaintiff has not filed an opposition to Harleysville's motion for summary judgment here. Therefore, pursuant to Local Rule 56.1(a), the Court deems all material facts set forth in Harleysville's Statement of Facts as undisputed in this instance.

### B. ERISA Standard of Review

"ERISA is a comprehensive statute designed to promote the interests of employees and their beneficiaries in employee benefit plans." <u>Shaw v. Delta Air Lines</u>, 463 U.S. 85, 90

11

(1983). "An 'employee welfare benefit plan' includes any program that provides benefits for contingencies such as illness, accident, disability, death, or unemployment." Id. at 91 n.5 (citing 29 U.S.C. § 1002(1)). "ERISA does not mandate that employers provide any particular benefits," but it does "set[] various uniform standards, including rules concerning reporting, disclosure, and fiduciary responsibility for" employee benefit plans. Shaw, 463 U.S. at 91. (citations omitted).

ERISA § 502(a)(1)(B) authorizes a plan participant or beneficiary to bring a cause of action "to recover benefits due to h[er] under the terms of his plan, to enforce h[er] rights under the terms of the plan, or to clarify h[er] rights to future benefits under the terms of the plan[.]" 29 U.S.C. § 1132(a)(1)(B); see also Miller v. Am. Airlines, Inc., 632 F.3d 837, 845 (3d Cir. 2011). To assert a claim under § 502(a)(1)(B), a plaintiff must demonstrate that she "'[h]as a right to benefits that is legally enforceable against the plan,' and that the plan administrator improperly denied those benefits." Fleisher v. Standard Ins. Co., 679 F.3d 116, 120 (3d Cir. 2012) (citing Hooven v. Exxon Mobil Corp., 465 F.3d 566, 574 (3d Cir. 2006)).

Relying on Supreme Court precedent, the Third Circuit has explained "that 'a denial of benefits challenged under [ERISA] is to be reviewed under a *de novo* standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan.'" Viera v. Life Ins. Co. of North Am., 642 F.3d 407, 413 (3d Cir. 2011) (citing Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 115 (1989)).[9] In cases where a district court conducts a "*de novo* review, the role of the court 'is to determine whether the administrator ... made a correct decision.'" Viera, 642 F.3d at 413 (citing Hoover v. Provident Life & Accident Ins. Co., 290 F.3d 801, 808-09 (6th Cir. 2002);

---

[9] "If the plan gives the administrator or fiduciary discretionary authority to make eligibility determinations, we review its decisions under an abuse-of-discretion (or arbitrary and capricious) standard." Viera, 642 F.3d at 413. Because Harleysville concedes that the *de novo* standard of review applies in this case, the Court need not address the abuse-of-discretion standard in any further detail.

Moreover, the appropriate standard to be applied – whether *de novo* or abuse-of-discretion – remains the same without regard to whether the action challenges a denial of benefits or a discontinuation of benefits, as is the case here. See Vining v. Progressive Cas. Ins. Co., No. 12-cv-01124-RBJ, 2013 WL 3975220, at * 3 (D. Colo. Aug. 1, 2013) ("District court review of a denial or termination of benefits under ERISA is *de novo* unless the benefit plan 'gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan.'") (citation omitted).

<u>Perry v. Simplicity Eng'g</u>, 900 F.2d 963, 965 (6th Cir. 1990)).

"'The administrator's decision is accorded no deference or
presumption of correctness'" under the *de novo* standard of
review, and the district court is required to "review the record
and 'determine whether the administrator properly interpreted
the plan and whether the insured was entitled to benefits under
the plan.'" <u>Viera</u>, 642 F.3d at 414 (citing <u>Hoover</u>, 290 F.3d at
809).

IV.  <u>**ANALYSIS**</u>

    **A.  Plaintiff's Complaint**

Before analyzing the substantive arguments of Defendant's
motion, it is necessary to address for a moment the nature of
Plaintiff's claims in this case.  At the outset, the Court notes
that Plaintiff's complaint is not a model of clarity with
respect to the claims alleged therein.  The complaint purports
to assert two separate counts.  The first is entitled "First
Count – Contract – Declaratory Judgment."  (Compl. 2.)  The
second is entitled "Count II – Violation of ERISA."  (<u>Id.</u> at 3.)

The "First Count" alleges that Plaintiff "made a claim
against Defendant" ... for "enforcement of her rights under the
disability policy Plaintiff purchased from Defendant."  (<u>Id.</u> ¶
13.)  Plaintiff represents that although she "performed under
the terms of the contract by paying all premiums as and when

14

due[,]"[10] Harleysville denied to pay her claim for ongoing disability and also underpaid during the initial period of disability. (Id. ¶¶ 14-16.) "Count II" alleges that Plaintiff "obtained her disability policy through her employer" and as an employment benefit, this insurance policy is considered a welfare benefit under ERISA. (Id. ¶¶ 20-21.) Plaintiff contends that Harleysville failed to honor the insurance policy and thereby violated the terms of ERISA. (Id. ¶¶ 22-23.) According to Plaintiff, Harleysville's breach constitutes a continuing violation of ERISA because payments are due to Plaintiff on a monthly basis under the policy and she has suffered damages as a result of this breach. (Id. ¶¶ 23, 25.)

Admittedly, claims for ERISA plan benefits under § 502(a)(1)(B) are "in essence, ... the assertion of a contractual right" and thus are "contractual in nature." Burstein v. Retirement Account Plan for Employees of Allegheny, 334 F.3d 365, 381 (3d Cir. 2003) (citing Feifer v. Prudential Ins. Co. of Am., 306 F.3d 1202, 1210 (2d Cir. 2002)). However, the Third Circuit has emphasized that such claims, while contractual in nature, are not in fact common law breach of contract claims.

---

[10]     Despite Plaintiff's assertions that she paid all of the premiums under the Policy "as and when due", the Administrative Record makes clear that Plaintiff's employer paid 100% of the costs for the Policy. (AR 365.)

See Hooven, 465 F.3d at 572-73 (observing that while contract principles apply in ERISA cases, a plaintiff's right to relief for allegedly denied benefits is not grounded in contract law but in ERISA); see also Burstein, 334 F.3d at 381 (recognizing that ERISA § 502(a)(1)(B) claims are governed by a "a federal common law of contract, informed both by general principles of contract law and by ERISA's purposes as manifested in its specific provisions.").

Although it is inarticulately pled, the Court construes Plaintiff's "First Count" as one asserting a breach of contract claim regarding the terms of the long term disability Policy at issue. However, given that Plaintiff's claim against Harleysville clearly relates to an "employee benefit plan," this claim must be analyzed within the statutory framework established by the ERISA, rather than in accordance with common-law contract principles. Hooven, 465 F.3d 573-74. Accordingly, Plaintiff's "First Count" is essentially subsumed by Count II of the complaint regarding alleged ERISA violations. The Court therefore interprets Plaintiff's complaint to assert a single cause of action under ERISA § 502(a)(1)(B) based on Harleysville's alleged improper discontinuation of Plaintiff's benefits and its alleged underpayment of benefits during the initial period of disability.

**B.   Harleysville's Decision to Discontinue Benefits**

As noted supra, Harleysville concedes that the Policy "at issue does not grant Harleysville ... discretion to make benefit determinations, [and] therefore, the *de novo* standard of review applies." (Def.'s Mem. 6.)  Harleysville argues that under the *de novo* standard of review, the issue before the Court "is whether the proof of disability submitted by the claimant is 'objectively satisfactory.'"  (Def.'s Mem. 6) (citing Gallagher v. Reliance Standard Life Ins. Co., 305 F.3d 264, 270 (4th Cir. 2002)).  Pointing to the video surveillance of Plaintiff conducted by Claims Bureau USA, Inc., Plaintiff's failure to attend the FCE, the changed opinion of one of Plaintiff's own treating physicians, and the opinion of a physician hired by Defendant, Harleysville contends that the evidence in this case does not come close to supporting Plaintiff's claim for disability benefits.  (Def.'s Mem. 6-10.)  Harleysville further asserts that "there is no better objective evidence of Plaintiff's capabilities than her documented activities during [the June 2010] surveillance which [directly] contradict[s] her claimed limitations."  (Id. at 11.)

In light of Harleysville's concession that the proper standard of review here is *de novo*, and in the absence of any argument by Plaintiff for application of an alternative standard, the Court will review the discontinuation of Plaintiff's benefits *de novo*. Accordingly, Court's role "'is to determine whether the administrator ... made a correct decision'" in discontinuing Plaintiff's long term disability benefits. See Viera, 642 F.3d at 413. In making this determination, the Court reviews the Administrative Record without deference, or a presumption of correctness, as to Harleysville's decision, and independently evaluates "'whether the administrator [Harleysville] properly interpreted the plan and whether the insured was entitled to benefits under the plan.'" Id. at 414.

Because the Court is reviewing Harleysville's decision to discontinue Plaintiff's benefits and the denial of her appeal *de novo*, the Court has discretion to consider "any supplemental evidence" presented by the parties beyond that contained in the Administrative Record. Viera, 642 F.3d at 418. In this instance, however, Plaintiff did not oppose Harleysville's motion for summary judgment, and thus did not submit any supplemental evidence for the Court to review. According, in

ruling on the motion, the Court has no alternative but to rely entirely on the Administrative Record as presented by Defendant.

As set forth below, after reviewing Harleysville's decision to discontinue Plaintiff's long term disability benefits and the denial of her appeal under the *de novo* standard, it is clear from the Administrative Record and the undisputed facts that Harleysville's decisions were correct. Harleysville properly interpreted the terms of Plaintiff's Policy and accurately decided that Plaintiff was no longer entitled to disability benefits because there was no objective evidence supporting her continuing disability. See Viera, 642 F.3d at 414. Accordingly, Harleysville is entitled to summary judgment on Plaintiff's ERISA claims as a matter of law.

Under the terms of the Policy, "Total Disability" means "(1) the inability of the Insured to perform any of the duties of h[er] occupation; (2) the Insured is not receiving any earnings for performing any work or service; and (3) the Insured is under the regular care and attendance of a legally licensed physician[.]" (See Def.'s SOF ¶ 7; AR 369-370.) The Policy further provides that "after the first 24 months of benefit payments, the Inured must also be unable to engage in any work or service for which he is reasonably qualified by education, training or experience." (See Def.'s SOF ¶ 7; AR 369-370.)

At the time Plaintiff initially filed a claim for benefits under the Policy, her treating physician, Herman Cohen, D.O., diagnosed her with migraine headaches, cervical radiculopathy, cervical strain, and depression. (See Def.'s SOF ¶ 9; AR 722.) As a result of her diagnoses, Cohen placed certain restrictions and limitations on Plaintiff's activities including limiting her to one hour each for standing, sitting, or walking, and completely prohibiting her from lifting any amount. (See Def.'s SOF ¶ 10.)

Plaintiff's report of her subjective symptoms was consistent with Cohen's original limitations and restrictions. In a number of telephonic interviews with Plaintiff during the time benefits were being paid, Plaintiff indicated to Defendant's representatives that: she was in constant pain, that that she could not walk or wear high heels, that she could not sit at the computer because she would "go[] into spasms", that she was unable to wash dishes, to walk up the steps carrying a laundry basket, or to go purchase groceries by herself as a result of her continuous pain. (AR at 622.) Plaintiff complained of neck pain so severe that it made driving difficult or impossible. (Id.) Plaintiff noted that on one instance when she was driving her neck pain was so intense that she "pulled over and vomited for a half hour[.]" (Id.) By January of 2010, Plaintiff further

advised that she remained unable to work, that she had no feeling in her arm resulting in her dropping objects she tried to hold, and that she was in bed 3-4 days a week as a result of her continual pain.  (Id. at 301.)

The summary judgment record demonstrates that Harleysville paid disability benefits to Plaintiff for approximately thirteen months based on this information because Cohen's original diagnosis and restrictions made clear that Plaintiff could not perform any duties of her occupation as an Office Controller, including sitting, standing, or walking for more than one hour, and thus was Totally Disabled within the meaning of the Policy. During the course of her claim, however, Plaintiff's medical information was reviewed on a regular basis for ongoing support of her disability in accordance with the Policy terms. Harleysville eventually determined that video surveillance of Plaintiff was necessary to further assess and understand her condition.  While under video surveillance, Plaintiff was observed driving herself to a local bank, parking her car, and entering and exiting the bank, while carrying a pocketbook over her right shoulder.

She was also observed driving herself to and from – and entering and exiting – multiple local department stores and other retail establishments including Kohl's, Bed, Bath, and Beyond,

Target, and Joann's Fabric. Upon exiting Bed, Bath, and Beyond, Plaintiff was seen with a pocketbook over her right shoulder, while simultaneously carrying a white plastic bucket in her right hand and a large white shopping bag filled with items in her left hand. Plaintiff was further observed standing in line and carrying other packages during her shopping excursions. On multiple occasions Plaintiff was able to lift the items she purchased into the trunk of her car and close the trunk with no difficulty. She was even observed doing a "slight jog" into one of these stores. Moreover, while parking her car, backing out of parking spaces and driving to complete these errands, Plaintiff appeared to turn her head from side to side on multiple occasions with no apparent straining or discomfort.[11]

Under the terms of the Policy, Harleysville further had the right "to examine the person of the Insured when and as often as it may reasonable require during the pendency of a claim[.]" (AR 378.) Therefore, when the video surveillance revealed information that contradicted previously provided medical

---

[11]   To be clear, Harleysville did not submit a copy of the actual video surveillance to the Court in connection with this motion, and the Court has not independently reviewed the video footage. Rather, the Administrative Record includes still photos taken from the video surveillance footage as well as a summary report of the observations made by Claims Bureau USA, Inc.'s investigator.

information and Plaintiff's subjective reports of her condition,

Harleysville referred Plaintiff for a FCE in order to determine

her then existing limitations and restrictions pursuant to its

right under the Policy.

The Policy further provided that "no further benefit [would]

be provided ... in connection with [the] disability" if "the

Insured cease[d] to be Totally Disabled, or if [s]he fail[ed] to

submit proof of continence of such disability when required, or

if [s]he fail[ed] to be examined medically when required[.]"  (AR

378.)  In accordance with the Policy, Plaintiff agreed to attend

the FCE and confirmed her attendance for the August 18, 2010 FCE.

Despite doing so, Plaintiff ultimately did not attend the FCE.

(See Def.'s SOF ¶ 15.)  Thereafter, Harleysville sent Plaintiff a

letter dated August 24, 2010 which explained in pertinent part,

> In conclusion, we have determined that your
> observed functional capacity does not support your
> inability to perform your own occupation as an
> Office Controller.  As you did not attend the
> Functional Capacity Evaluation scheduled, we were
> not able to continue benefits beyond August 24,
> 2010, as you no longer meet the definition of
> disability as defined by the policy.

(AR 267).

After Plaintiff's benefits were discontinued and Plaintiff

appealed that decision to Harleysville, Plaintiff submitted to

Harleysville a statement from another one of her treating

physicians, Vincent Padula, D.O., in further support of her

claim.  In pertinent part, Padula explained:

> I have been treating Ms. Palma over the past two
> years for chronic cervical pain including cervical
> disc herniations at C5-6 and C6-7 as well as
> cervical radiculopathy.  At this point in time, I
> do not feel that Ms. Palma is able to work.  She
> requires chronic pain medication as well as
> interventional pain management procedures
> including cervical epidural steroid injections and
> cervical facet injections.
>
> At this point in time, I do not feel she is able
> to work because of medication she is on.  Also, it
> is very difficult for her to use her upper
> extremities and she has limited mobility of the
> cervical spine.

(AR 56.)

The video surveillance footage relied upon by Harleysville

was subsequently presented to Padula and he was asked to respond

in writing to a series of questions posed by Harleysville.  The

Court reproduces below the questions and Padula's response to

each.  It is clear from Padula's responses that he changed his

assessment of Plaintiff's disability status based on viewing the

video surveillance.

### Question 1
Are the activities Ms. Palma was observed performing on June
17, and June 18, 2010 consistent with her presentation in
your office?  Please explain.

➤ **Padula's Response:**
No. pt. appears to be turning [her] head fine when she is
backing up in her car.  She does not appear to have
restrictions to moving.

24

**Question 2**
Does the enclosed videotape surveillance alter your previous
opinions regarding Ms. Palma's functional capacity?  Please
explain.

➤ **Padula's Response:**
   Yes.  She appears capable of using her upper extremities.

**Question 3**
As recently as October 13, 2010, you stated that Ms. Palma
is unable to work because of "medication she is on."  Has
Ms. Palma's driver's license been restricted due to
prescribed medications?  If she requires the medications
that you have prescribed, and takes them as directed in
terms of dosage and frequency, would driving a motor vehicle
be advisable?

➤ **Padula's Response:**
   No, pt. cannot use opioids before driving.

**Question 4**
In your correspondence dated October 13, 2010, you also
indicated, in part, "it is very difficult for her to use her
upper extremities and she has limited mobility of the
cervical spine . . ."  Please comment on Ms. Palma's use of
her upper extremities and her cervical spine mobility during
the activities observed on June 17, and June 18, 2010.

➤ **Padula's Response:**
   She appears to be using upper extremities and moving
   cervical spine [without] difficulty.

(AR 127-128; see also Def.'s Mem. 9.)

Additionally, because Plaintiff raised her inability to

attend the FCE in August of 2010 as part of her appeal of

Harleysville's original decision, Plaintiff's disability claim

was referred to Marianne B. Jacobs, D.O., a physician Board

Certified in Neurology, Pain Management and Sleep Disorders, for

25

an independent review to determine Plaintiff's level of functional capacity. (Def.'s SOF ¶ 18.) Jacobs determined that "neither Plaintiff's symptoms (subjective and/or objective) nor the effects of treatment she was receiving would preclude her from working." (Def.'s SOF ¶ 19) (deemed admitted under L. Civ. R. 56.1); (see also AR 142-146.) As summarized in Defendant's Statement of Facts, "Jacobs found no support for Plaintiff's complaints of disability and concluded [that] Plaintiff ha[d] no restrictions whatsoever related to walking, standing, or sitting and is only limited to lifting and carrying up to 25 pounds and reaching overhead ten pounds." (Def.'s SOF ¶ 21) (citing AR 147) (deemed admitted under L. Civ. R. 56.1).

The evidence presented in the Administrative Record clearly supports the discontinuation of Plaintiff's benefits and the denial of her subsequent appeal. Plaintiff failed to submit objectively satisfactory proof of her continuing disability, and the video surveillance directly contradicts not only her subjective reports of her symptoms, but also those of her own treating physicians. In fact, this video surveillance was sufficient to convince Plaintiff's own physician, Padula, that her reported symptoms were not actually consistent with her level of functional activity. Padula's conclusions were further verified by an independent review of Plaintiff's claim by Jacobs

who independently determined that Plaintiff was not disabled as she had no restrictions which prevented her from performing the duties of her occupation. Moreover, Plaintiff's Policy required her to submit to physical examinations as required by Harleysville, and expressly stated that a failure to attend would result in "no further benefit ... be[ing] provided ... in connection with that disability." (AR 378).

Under these circumstances, Harleysville's decision to discontinue Plaintiff's benefits and its subsequent decision to deny her appeal were correct. These decisions were consistent with the terms of the Policy, the medical evidence presented, and the video surveillance obtained. Accordingly, Harleysville is entitled to summary judgment in this case.[12]

---

[12]  To the extent Plaintiff's complaint claims that Harleysville underpaid Plaintiff's disability benefits during the initial payment period from May 2009 through August 2010, the Court finds that Harleysville is entitled to summary judgment on this issue. The Policy clearly reflects that Plaintiff is entitled to a benefit of sixty percent (60%) of her monthly gross income. (See Def.'s SOF ¶ 8; AR 387.) It is undisputed here that Plaintiff's monthly gross income was $6,500. (Def.'s SOF ¶ 2.) Because Harleysville paid the full benefit amount of $3,900 per month – which is 60% of $6,500 – there was no underpayment of benefits here.

IV.  **CONCLUSION**

For the foregoing reasons, Defendant's motion [Doc. No. 11] for summary judgment is granted.  An Order consistent with this Opinion will be entered.

Dated: December 23, 2013          s/ Noel L. Hillman
At Camden, New Jersey          NOEL L. HILLMAN, U.S.D.J.